Hear ye, hear ye, hear ye. The United States Court of Appeal for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. This is Judge Charles Wilson in Tampa. Judge Beverly Martin is in Atlanta and Judge Joe Pryor is in Atlanta and we're here for oral arguments in Donald Broadnax versus the Alabama Department of Corrections. John Palumbi is here for Appellant Broadnax. Richard Anderson is here for the Commissioner of the Alabama Department of Corrections. And counsel, I would advise you that we have read the briefs, we've examined the record. That will assist you in narrowing the focus of your arguments for the time that you have available this afternoon. Mr. Thomas is the courtroom, Mr. Thomas is the courtroom deputy. And he will also serve as your timekeeper. And he will give you a two minute warning when your time to argue is about to expire. And we will also advise you when your time to argue has expired. So it appears that we are ready for arguments this morning, or this afternoon. And we'll begin with Mr. Palumbi on behalf of Appellant Broadnax. Mr. Palumbi, you may proceed with your argument. Good afternoon, Your Honors, may it please the court. From his first conversation with the police to this present day, Donald Broadnax has maintained his innocence. The state's case against him was completely circumstantial. And despite defense counsel believing in his innocence and understanding that there were only two places he could have been at the time of the crime, they did not interview anyone at the work release center where he was incarcerated. Had they done so they would have uncovered not only evidence, but witnesses who would have testified who would have supported an alibi defense for Mr. Broadnax and weakened the state's case even further than it already was. As the Supreme Court said in Strickland, a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. The state's case against Mr. Broadnax was so weak that defense counsel's errors in failing to properly investigate the facts of this crime indicate that there is a reasonable probability that the result of this case would have been different. This is this is this is this is Judge Wilson. And so we have to decide whether or not the Alabama Court of Criminal Appeals unreasonably applied Strickland versus Washington. By now, you have probably read the Supreme Court's decision in May's versus Heinz. It was decided yesterday, and it sets forth a pretty, pretty difficult standard of review for a habeas petitioner to overcome when a state court has considered the entire record, which the state court has done in this petitioner's claim that he was denied the effective assistance of counsel. How are you? How are you going to be able to overcome that standard of review in this case, given the Supreme Court's decision yesterday in May's versus Heinz? Your Honor, I would point out that Mr Broadnax's case I can distinguish from May's versus Heinz. The Supreme Court specifically noted in May's that the evidence in that case was overwhelming against against the defendant. Here, we do not have that. And that Strickland does take into account the strength of the evidence against the against the defendant when determining whether counsel's actions are reasonable. In in this case, there was there was no eyewitness testimony. No one saw Mr Broadnax commit any of the offenses that they claimed were committed at his place of employment. No one saw any of the events that the state claimed were committed by Mr Broadnax in Birmingham. And also important, no one saw Mr Broadnax take actions that the state has claimed were done to conceal his involvement in this crime. So the reason was there was no testimony at the trial was Johnny Baker and eyewitness who saw broadnecks driving stamps car. He saw he saw Mr Broadnax in the car. He did not see Mr. Broadnax drive the car off of the property, nor did he see any of the the events that the state implied took place before Mr. Baker saw Mr. Broadnax in the car. Namely, by that point, according to the state's theory of events, Mr. Broadnax had already killed Jan stamps and placed her in the trunk of the car. There was an earring found at Wellborn. Where was that ear? And it matched the ear earring in her car, right? Yes, Your Honor. Okay. Where was it? It was a earring found near where he was at Wellborn. The earring was found on the grounds at Wellborn, around the back of the plant, Your Honor. And that was where that that was where that earring had been found. Okay. And and the clothes with the blood from the stamps DNA was found where it was found at the center. Yes, Your Honor. In fact, it was found at the clothes were not found until after Mr. Broadnax was taken in custody. And there was also testimony at the state post conviction hearing that the mattresses at the work release center, if you can imagine, Your Honor are were approximately three inches thick. And two corrections officers testified at that post conviction hearing that those mattresses were checked every day. Things were not allowed to be kept under those mattresses. So again, we have a situation that allegedly Mr. Broadnax came into the work release center with clothes that had blood on them changed out of those clothes, hid them under someone else's mattress, again, with no one seeing any of this, so that that for all of the state's case, it is completely based on suppositions and, and circumstantial evidence, which had Mr. Broadnax, Broadnax's defense attorneys done the investigation they should have, which was questioned people at the work release center, they would have learned both things that would have supported an alibi for Mr. For Mr. Broadnax, and would have weakened the state's case. Mr. Paul, may let me go back for a moment to judge Wilson's question about the blood on the uniform. Do we know from the record how much blood there was on the uniform? It was very, very little blood, Your Honor, that was on the uniform. And in fact, they attempted to test both the uniform and the boots that they alleged Mr. Broadnax wore, and they could not take any DNA from the boots. It was still minimal blood that was on the shirt from Mr. Broadnax. So so if he had come my my, my point was really, if he had come through the guard station wearing the uniform, would it have been noticeable? Do we know from the record? We don't necessarily know from the record, Your Honor, whether it would have been noticeable. But even if it hadn't been noticeable, Your Honor, there's still the issue of how he could have in a large room, which this is, they did not have individual cells at this work release center, they were all in a dorm type setting, how he would have changed out of that shirt into another shirt, and hidden that shirt under someone else's bunk without anyone seeing him. Well, Mr. Columbia, you've got three issues on appeal here. And I guess your primary claim is that Broadnax was denied the effective assistance of counsel because his lawyers failed to investigate the possibility of an alibi defense that there were got five people who you know, testified at the evidence you're hearing that it's possible that he could have been somewhere other than where this crime was committed. I guess the concern that I have is that why is it unreasonable for his lawyers to rely on the information that Mr. Broadnax gave him, that he never left Wellborn until 1130 that night and sat through the entire trial while his lawyers presented that theory to the jury that he never left Wellborn until 1130, 1140 that night. And then, and I'm looking at the Alabama Court of Criminal Appeals decision, the judge there says it was not until 2008, 12 years after the crime. And after this court had reversed the judgment denying his amended petition that he changed his story now, with regard to the whereabouts on the night of the murder. 12 years later, he comes up with a completely different theory of defense, which contradicts what he told his lawyers, and what his lawyers based his defense on. And so the having a hard time accepting your argument that his lawyers were that the Alabama Court unreasonably applied Strickland versus Washington based on those circumstances. Your Honor, I'd like to be the Alabama Court focused on the fact that Defense Counsel were not asked about this specific alibi. When they testified at the first post conviction hearing, as this court noted in Reeves, there does not have to be testimony from the lawyers to establish whether the lawyers were ineffective. Now, as to the other question about whether lawyers are required to solely focus their investigation based on what the client told them, the Supreme Court's opinions in Rompia state that you that a lawyer is not to merely rely on those but to follow evidence that they have that they've received, or other evidence that would indicate that they should investigate further or thing further. Here in in this situation, these attorneys were aware of Mr. Broadnax's statements. They attempted according to them at the first post conviction hearing to find witnesses at the work release center, they claimed they couldn't, they could not find anyone. However, the length of time the evidence that was found, Your Honor existed at the time of the trial. This is not evidence that that didn't exist until 12 years later. This existed at the time of the trial. These people were available at the time of the trial, they were employed, the two corrections officers were not only employed at the work release center, but were on duty that evening. Now, you know, these these alibi, these these potential alibi witnesses, they're not airtight now. I mean, they use words like, well, probably he was there. I mean, and I don't see any one of these witnesses who places him at the center at 9pm, which is about the time that the murders were committed, not a single one places in there at 9pm, which is the time around the time that the murders were committed. Is that is my understanding correct? Your Honor, there are pieces of evidence that placed Mr Broadnax at the work release center at a time that it would have made it impossible for him to be committing the murder in Birmingham at approximately 9pm. You are correct, Your Honor, that that we have a time based on where the car was first seen in Birmingham, which was 75 miles away and approximately a 90 minute drive to the to Alexander City. We have that at approximately 845 to 855. Meaning that had Mr. Broadnax been at the work release center between nine and 930. He it would have been impossible for him to have been in Birmingham, abandoning that car. We have two pieces of evidence that that indicate that Mr. Broadnax was in the work release center between nine and 930. First, we have the work release center inmate sign in sign out law, which states this which had Mr. Broadnax sign in at nine o'clock. Second, we have the testimony of corrections officer Wexton, who testified that when he came on his shift, which was normally between 930 and 10, he saw Mr. Broadnax there. And given those two pieces of testimony, that damaged the state's already very tight timeline for Mr. Broadnax committing this crime. So those two witnesses alone, combined with corrections officer come be who testified that the count that he did before his shift ended clear and the testimony of Donald Bowden, who said that he was the van driver who brought Mr. Broadnax back between nine and 10 p.m. That night, he said, probably, he said, probably, yes, Your Honor. But we also have to remember, Your Honor, Mr. Mr. Bowden was testifying at a post that was conducted approximately 15 years after the event. These witnesses will say that's, that's one of the problems that maybe we're having with your argument that Mr. Broadnax sat through this entire trial, and never provided any of this information to his lawyers. And now 12 years later, he says his lawyers were ineffective because they didn't have the information that he failed to provide for him. He sat through the entire trial with his defense being that, Oh, no, I never left well born. And now, which completely contradicts what he's claiming on post conviction review. I guess I'm having a hard time understanding how his lawyers can be ineffective if they were not presented with this information by Mr. Broadnax. And he sat through the entire trial. That was a different theory. His his lawyers, while his lawyers did attack the state's timeline, they never actually presented any evidence at all. They were given an alibi, the jury was given an alibi instruction, but there was no evidence about alibi that came that that they introduced. And the ABA guidelines state that an attorney is not merely to take his client's statements, and he even his clients version of the events of the crime, and just rely on that in order to defend in a capital case. They, they may start with that. However, there in order to fully investigate the case, they should have at least spoken to people at the work release center and spoken to these very people had they done so they would have found this evidence and could have even before trial gone to Mr. Broadnax and said, we have evidence. You know, is it possible you were mistaken about the times? Is it possible that you were mistaken about this? Because we have people who will say that you were actually at the work release center at that time. As Dr. Benedict testified at the second hearing, Mr. Broadnax has cognitive issues that could have played into misremembering what happened or what has what had gone on. In fact, if Mr. Broadnax, one of Mr. Broadnax's statements to the police, you have to say he was very confused. Your honors, if I may, in my last two minutes, I if there are no further questions about claim one, I would just like to very briefly touch on claims two and three. With respect to the second issue that we've raised, the argument that we are making is that Mr. Broadnax in order to prove ineffective assistance of account of counsel in the penalty phase of a case should have been permitted to put on evidence that would have been admissible at trial. The evidence in question was Dr. Ken Benedict testifying about collateral interviews that he did with witnesses. The state admitted even during the post conviction hearing, that that evidence would have been admitted would have been admissible at trial. And that while it was odd, it was not admissible in rule 32. Our argument we accept your if we accept your argument, we would have to overturn a state evidentiary rule that hearsay doesn't apply on post conviction. Your honor, what you would have to overturn is a state evidentiary rule that works to keep out a hearsay that would have been admissible at a trial, and keeps it out to prove whether defense counsel was ineffective for not putting that evidence on at trial. So it's narrower than overruling it entirely, your honor, there would be situations where hearsay would be admissible in a rule 32. Our specific point is that this was admissible evidence that would have been admissible at trial. Your honor, I see my time has expired. All right, I think you've reserved some time for rebuttal, Mr. Columbia, and we'll hear from Mr. Anderson on behalf of the Commissioner. Thank you. My pleas of court, I'm rich Anderson for the appellee. First of all, this was a highly aggravated crime for aggravating circumstances applied. Mr. Broadnax was 35 years old when he committed the crime and killed Jan and D'Angelo. The first thing I want to do with regard to the first issue is correct a mistake in petitioners brief and in his argument this morning, where he says that Mr. Broadnax has always maintained his innocence. To be sure, at time of trial, Mr. Broadnax told counsel that he had an alibi, and that he didn't do it. And now he has a different contradictory alibi, and says that he didn't do it. But in 2003, about 18 years ago, when he filed his first rule 32 petition in Alabama, on post conviction review, he this, of course, was a pleading that was verified by counsel as being true. And Mr. Broadnax described the breakdown of his relationship with his wife, Jan. Her decision to leave him after he was denied probation, or parole, and concluded and this is actually tell your honors, this is volume 22 of the portion I'm going to quote here is from page 252 of the original petition. Mr. Broadnax alleges that after Jan told him she was leaving him, he only knew his mother's way of dealing with loneliness and fear. In a moment without thought or explanation, he lashed out against the person closest to him. This lashing out would have irrevocable consequences and the two people were tragically killed. So we have three different versions from Mr. Broadnax. First, as I say, he didn't do it because he was at Wellborn. Second, he did do it, but it was because of a quote, psychological collapse. And third, he didn't do it, but because of an alibi that contradicts the first. And moving on from that, let's look at the current claim of ineffectiveness. Mr. Broadnax is claiming that counsel were ineffective for not investigating an alibi theory that he never told counsel about. And one that is contradictory, completely contradictory to the alibi theory that he told counsel about. Counsel did investigate that theory, of course. We know that he visited Wellborn Forest Products. We know that he used the services of an investigator. We know that he reviewed all of the evidence. That's one of the things he testified to in 2005, when he was being questioned about the theory of defense trial. We also know that the evidence showed that Mr. Broadnax gave a statement to the police in which he confirmed that he was at Wellborn until at least 1030, that he was there until a man named Mark. This was Mr. Broadnax identifying the person who called a van for him. A man named Mark called a van to pick him up. We also know, and counsel would have known, that Mark Chastain, a disinterested person, an employee of Wellborn Forest Products, not an agent of the state, both he and his wife identified, one, his wife identified a black man getting out of a truck. And then she identified the same man coming out of Wellborn with her husband. Her husband, Donald Broadnax. In fact, he described Donald telling him, I'm Donald. And they both identified him as a black man. As Strickland teaches us that reasonableness of trial counsel's investigation depends critically on the information that his client gives him at the time. And in this case, the information that Broadnax's counsel was given, and the possibility that Broadnax returned to Alexander City work release at nine o'clock or any time. Mr. Anderson, but don't also have some cases that say a lawyer can't just rely on the client story alone. That's just one factor to be considered. There's still an obligation to independently and thoroughly investigate plausible defenses. Correct, Your Honor. And that's why I emphasize the fact that counsel didn't merely take his client's word for it. He testified in 2005, that he looked at what his client told him and the evidence that I think that passage is actually cited in petitioners brief. Don't you think he should have at the very least taken a look at the attendance logs? Well, your honor, the he had no reason to look there. And that's I want to actually talk about something that that Mr. Palami mentioned that attorneys need to follow the evidence that they perceive. And we talk about red flags a lot when we're evaluating attorney performance. And a red flag, generally speaking, it's something that's visible. It's something that an attorney can see, that invites further investigation, and a court can reasonably and meaningfully evaluate how an attorney reacts to that. Mr. Columbia mentioned Rumpel. Of course, we know from Rumpel, that counsel knew that his client had a record, he knew that he had a conviction that was going to be at issue and the case, he knew that that record was right there in the courthouse, and he didn't ever go look at that red flag or follow it up. In this case, we have essentially a red flag being hidden in a bushel basket. It is, if Mr. Broadnax had ever mentioned this, your honor, then perhaps this could be deemed a red flag that counsel didn't follow up on. But when the when the when his clients alibi is given to him, and it's substantiated by other evidence that counsel has access to, and all of this together forecloses the possibility of there being anything to look into, then it is, it would be difficult to hold counsel responsible and hold them essentially to a standard of clairvoyance, to know that he should look in a place where all of the evidence says there is nothing to find. Mr. Anderson, Mr. Gervley-Martin, how are you? I need your expertise and kind of walking me through Alabama evidence law. You know, I've practiced in Georgia and federal court, but you know more than I do about Alabama evidence law. And I want to talk in particular about the testimony of Dr. Benedict. And my understanding is that the ruling of the Alabama courts was, look, he was relying on hearsay. And because the rules of evidence are in effect, in post conviction proceedings, he can't, he can't testify to those parts of his testimony that rely on hearsay. Am I right about that? Essentially, Your Honor, yes. Okay. And I'm familiar with that. Because, you know, in federal court, you can, the rules of evidence don't apply here, a sentencing and say hearsay testimony. But so I want to start. So in your view, as Dr. Benedict, was, was he an expert witness? He was an expert witness, Your Honor. Okay. So here's what I don't and, you know, in formulating his opinions, he was talking to family members, he learned that, you know, horrible history, Mr. Broadnax had been raped as a 12 year old, etc, etc. And in my experience, it's very common for experts to rely on hearsay testimony. And in fact, the rules of evidence allow it, don't they? The federal rules do, Your Honor. And in, but in 2010, in Alabama, the Alabama rules, and the federal rules, were not in agreement on this point. And they're the same. They're the same now, is what you're saying. But back then, I believe that they are now, Your Honor, but they were not in 2010. And in 2010, Alabama case law and the rules provided that an expert one couldn't be used as a force as a practice that federal courts have, have criticized to that, to use an expert merely as a conduit. But I understand your, your point and your question about the basis of the opinion. In Alabama in 2010, starting from a case, ex parte Ronald Harvey Wesley, the state which was 1990 case, the rule in Alabama was that an expert could not base an opinion on testimony that was inadmissible. And as consequence, the practice in many cases in Alabama post conviction, and something I would note, an avenue that was fully available to Mr. Broadnax here was to put on the testimony of family members to put on the family history and psychosocial history, through live witnesses with the presence of the expert in the courtroom, the expert. No, I got that. I mean, he could. So you agree, Mr. Broadnax. I mean, I'm sorry, Mr. Bennett, Dr. Bennett could have testified to all of that stuff. And sent in the sentencing or in the mitigation phase of the trial. Correct, Your Honor, in the penalty phase of a trial, as opposed to post conviction. The rules of evidence are relaxed. Okay, so what you're saying is at the time, the ruling in the Alabama courts, was it, Dr. Bennett can't give his expert opinion on these areas that touch on his conversations with, you know, Mr. Broadnax family. Alabama law is different than federal law. At that time, Your Honor, yes, it was. Okay. And that was the basis of that ruling. That's correct, Your Honor, I believe. Okay. Okay. But I still, so what about, and I really, I'm not trying to, I really don't know the answer to this. So what about federal rule of evidence 803? And I think Alabama has the same thing that, you know, talks about exceptions to the hearsay rule. And, and there's one about reputation concerning personal or family history. And that accepts that kind of informed testimony from being hearsay. Your Honor, that has frequently been a response to this objection that counsel have raised in Rule 32 hearings. I can tell you that it's, it's been rejected because generally that exception is limited to family history in the sense of genealogy. Mr. Broadnax's parents were these people and their parents were these people. It is not intended to embrace narratives or like the culture in the household. Correct, Your Honor, it's not intended to embrace that, but rather the more definitive, this is who the, who the parents were. And it's generally, my  attorney, things like that. Okay. So going under the way the law was at the time, the law that was applied to Mr. Broadnax, if a death row inmate had a claim that my lawyer was ineffective, because he did not present the testimony of a family member, how would they show prejudice at the Rule 32 hearing if they're not allowed to present a neuropsychologist at that time who does rely on, you know, hearsay accounts of, you know, well, this child was raped when he was 12? They would do as other Rule 32 petitioners have done. And in my experience, I'm thinking of the case of Sandra Blackmon, which was a multi-day evidentiary hearing I had in Houston County, where counsel, aware of this rule, being an Alabama practitioner, everybody knew about it, put on the family members themselves to testify, allowing the state the benefit of cross-examination. And given that petitioner has a heavy burden, a very heavy burden, as the court has agreed to. Just assume for me, family members are willing to tell these horrible stories of Dr. Benedict, but they're not willing to testify in court. It's just, it's just not coming in under those circumstances, right? That would be hearsay in that case, Your Honor. And in 2010, in Alabama, it would not have come in. But today, it could come in, because the rule of evidence has changed in Alabama. It that is a somewhat of a hypothetical, because I believe I would still object if an expert just got up. I bet you would. I'm just trying to know. How do you think the judge would rule on that? But the, the, the rule is closer in conformity with the federal rule now. It was not, however, at the time. You know, and I mean, I've been looking at the advisory notes of the Alabama, you know, evidentiary rules, and it, it talks about, you know, expert reliance on, on what the concern seems to be is that, you know, that we don't want to hear the jury to hear all this. You know, basically, the hearsay testimony, the things that the family told the expert witness, you know, without it being tested. But, you know, that isn't an issue in a Rule 32 hearing, right? Well, there's no jury at a Rule 32 hearing. There's no jury in a Rule 32 hearing, you're correct. But there's also the state's interest and the state's right to defend its, its convictions in a way that, that upholds everything the Supreme Court has said about a petitioner's burden of showing entitlement to relief. And part of that is subjecting that evidence to testing, to being able to cross examine witnesses and determine whether their stories hold up, and whether they're sufficiently strong to undermine our confidence in the original verdict. And of course, if somebody's story changes on cross examination, as I'm sure Your Honor knows they do, then that's going, that may lessen our, our concern about our confidence in the result. That's why the state believes it's very important to, to disallow this hearsay just as a general rule. Let me just ask you this, and then I'll give you back to my colleagues. As fun as this is for you, I'm sure. So I think you would agree with me if somebody hired a somebody, and that somebody's history included the fact that they were, had been raped when they were 12 years old. That would be the type of fact or data that a psychiatrist would, you know, regularly rely on in coming to a conclusion about somebody's mental state. If it's for the purposes of a medical diagnosis, I'm aware that there's a psychological evaluation. This person has problems, why do they have problems? Right. And, and that could be, of course, that is coming, presumably from the witness himself, the petitioner. And I mean, he's so ashamed, he won't tell it. So you hear it from other people. So it's reliable. I'm, well, I would, I would assume for me, assume for me, it's reliable. I would have to know what the indicia Oh, come on, you're not going to tell me a psychiatrist wouldn't ordinarily rely on the fact that a child was raped, and evaluating that person as an adult, if they had reliable reason to believe it had happened. A psychiatrist might rely on that, but that doesn't necessarily mean that a court should allow that fact to come in in a manner that's untested. But an opinion based on, you know, a group of facts that includes that fact would come into evidence, wouldn't it? Probably. Well, it probably would not have in 2010, in Alabama, Your Honor. Well, I think we've established that. But, but today it probably would, right? Because I mean, it's the same as the federal law. I, I couldn't say, Your Honor. Okay. All right. Thank you. That was helpful. Mr. Anderson, appreciate it. Um, well, I will return to the first issue. Um, yeah, I was, I was talking about Rumpilla v. Beard and the fact that there was a, something that trial counsel ignored. And that's the thing that we don't have here. Um, I would say this also distinguishes case from a Reeves v. Commission, which this, this court decided in November of last year. And there, again, there was something readily apparent that the record itself showed that counsel knew about. And this court, um, this court found that counsel terminated their investigation at an unreasonable point. Because while they knew that neuropsychological issues could be at a, they neglected to get an expert and to follow up. Um, of course here, we don't have that sort of red flag, that indicator that further investigation is necessary. Um, and, uh, I would note that, uh, you know, we do have in this case, reasonable jurists, Judge Kahlon, the members of the Alabama Court of to follow up on the evidence he had and not to go hunting for evidence that he not only didn't have, but that was contradicted by the evidence he had, uh, was a reasonable decision. I do want to note too, that the failure to recall counsel in this case, as your, your honors know, we had a 2005 evidentiary hearing, and then the petition was amended to allege this new and inconsistent alibi theory in 2008. But at the next evidentiary hearing, which I think was 2010, um, counsel was not recalled. So counsel was never asked, why didn't you look into his presence at, uh, uh, the work release center at nine o'clock? Uh, so we don't know the answer to that, but we can, we can say, uh, from the totality of the evidence that the explanation is clear that counsel was never told that he was there. He was told he was someone or somewhere else. And that's what all the evidence. Showed too. Um, and I want to, uh, judge Wilson, you know, very correctly noted some, some issues with the testimony of, uh, witnesses at the evidentiary hearing. Uh, no one at all saw Mr. Brodnack's come in at nine o'clock. No one testified that they saw Mr. Brodnack's, uh, fill in the inmate log. Um, and of course, the inmate log is one's totally self-serving too. It is, uh, it is filled out by the inmate himself. And, uh, and three it's contradicted in this case by the, the institutional law, the officer's law, which tracks the movement of the inmates in vans. As they go from the work release facility to other places. In this case, that log showed that Mr. Brodnack's, uh, returned from Wellborn at I think 1150. That of course comports with both Mr. Brodnack's testimony that he, uh, was still at Wellborn at 1045. It comports with Mr. Chastain's testimony that Brodnack's was still there at 1045 and that Mr. Chastain called a van sometime after that as he was driving home. And it also comports with the log entries of the man that was riding on the van, uh, with Mr. Brodnack's, Mr. Samuel, Mr. Samuel's inmate sign in log shows him arriving at 1150 and the officer's log shows him arriving at 1150. The only aberrant entry is Brodnack's. Um, and so to that extent, another reason for not presenting this evidence, even if counsel had found it would have been the fact that it could be taken as a consciousness of guilt. You, you argue in your brief that the logs, who, who writes, who writes in those logs, is that Mr. Brodnack's writes that in itself? There, there, there were the two logs. There was the inmate log, which is the one that has the Mr. Brodnack's entry where he wrote nine o'clock as the time that he got back. That log was kept, uh, it was kept outside of the office where the corrections officers stayed, not particularly closely monitored. Um, but then there was a second log, which we've heard first log who fills that, who's writing the inmate. I'm sorry. The inmate himself. Okay. Okay. And the second log, which is the officer's log is the one filled out by the duty officer who is essentially logging people in and out of the facility so we can keep track of them. And that log showed that Mr. Brodnack's was not at, well, I'm sorry, at Alexander city nine at 10, at 11 or any time other than 1150. Um, probably the best witness that Mr. Brodnack's had was McCarthy Whetstone, uh, who Brodnack's alleges says that he, uh, found Brodnack's waiting for him when he arrived around nine 30. But again, we see the importance of cross-examination because that story really didn't hold up. Um, when we actually put the witness on the stand, he testifies that, well, maybe sometime after 11. Um, and then he says, well, maybe it was, uh, between 11 and some other time. His memory was unclear and nothing in his, uh, testimony actually contradicted the state's theory. Uh, Donald Bowden or Donald, you know, Donald Bowden, who was the driver of the van who also testified said that he wouldn't have any reason to disagree with Mr. Brodnack's statement that he was still at well-born at 10 30, or that he would have any reason to disagree with the officer's log, um, Roger Stolz. Can I just ask you one more question? I'm afraid your time has been run out. Um, this is a record question. Um, I remember reading this transcript and I can't remember who the judge was, whether it was the rule 32 hearing or whether it was just Kahlon in the district court, I suspect it was a rule 32 judge, but anyway, the defense council was trying to elicit testimony about the location of something and, um, you know, the judge kept kind of interrupting and going, everybody knows where that is. You're trying to speak. Do you know what I'm talking about? I mean, that would have been judged by Jones. Oh, okay. Okay. So that was a rule 32. Yes. So what was that about? I mean, it seemed like, um, I mean, when I read it and the judge said, everybody knows where Legion Field is, the bubble over my head was, I have no idea where Legion Field is. So it might've been helpful if the, the lawyer had been allowed to put that into evidence. What was going on with that? Well, uh, Judge Jones is a Birmingham native. Um, he has, in fact, we, we also learned during the hearing that he grew up in the same neighborhood as Mr. Brodhead. Yeah, I got that. Yeah. Um, and I didn't actually, so I grew up in a probably similar neighborhood in so I didn't know where Legion Field was. It is, it is well known. The location is well known to most Alabamians. I think probably even, um, but, uh, maybe not to Georgians, Your Honor. Did that interfere with the lawyer's ability to put in the mitigation evidence? I don't, I don't believe so, Your Honor. Um, certainly the decision maker in this case was a judge who was intimately familiar with the area where Mr. Brodnack grew up and, and I knew where Legion Field was. And I don't think that I would, I would suggest with respect that because the court doesn't know where Legion Field is, if we said it was at the intersection of 23rd street and 45th Avenue, that wouldn't tell us much more. So, so Mr. Anderson, if we could just go back to Dr. Benedict's. Yes, Your Honor. Testimony, he testified, he testified at the evidentiary hearing. He was just not permitted to testify about statements made to him by Brodnack's family members. Is that right? That's essentially correct, Your Honor. I think it may have impacted his opinion in some way. Uh, but I know that, that the intent had been for him to relay what, um, people told him, the stories that people told him. And when the state learned that we filed a motion in Lemony, uh, several days before the hearing and, uh, noting that our, our issue with that and the evidentiary problem, um, and of course, as we've said, had Brodnack's wanted to, he could have filed for continuance. He could have brought the witnesses to testify live. I'm looking at the Alabama court of criminal appeals decision. It looks like some family members did testify. At, in the 2005, uh, evidentiary hearing, there was, that was the, the 2005 was the first evidentiary hearing. And Mr. Benedict, uh, Mr. Benedict or Dr. Benedict testified at the second in 2011. Okay. In 2011, did any family members testify about what they told Dr. Benedict? No, Your Honor. Did, did, uh, Mr. Brodnack's testify? No, Your Honor. Okay. Um, I do want to, to note, um, let me see if I had, and one more question now, the Alabama rule on the admission of hearsay at, on post-conviction relief has changed and it's different now, right? That's correct, Your Honor. Well, no, no, no, I'm sorry. The, the rule on hearsay has not changed. However, the, the rule regarding experts and the basis of expert opinions has changed. So hearsay is still, uh, So if the hearing, if the hearing took place today, um, the state's motion would have been, the state's motion would be denied. The motion in limine would be denied, right? Potentially, Your Honor, uh, I think a court might be reluctant to allow an expert to act merely as a conduit and just to get up there and, and read out a whole bunch of hearsay statements. But, uh, I, I doubt that I would get an objection sustained on, uh, mentioning something someone said or, or limited basis. Uh, or if somebody, if the expert says, this is my opinion and it's based on the following list of facts and, and these, uh, stories told to the expert by the family members, what were among those facts, I mean, that's what experts do all day, every day, isn't it? That, that, uh, that's a potential, that's a potential issue too, Your Honor. That, that might be. In other words, the testimony would be allowed, or you're saying it might be allowed. That's what you're. Well, I would have to have an opinion about it. I would have to know exactly what the expert, I'd be, have to be sitting there in the courtroom. And if the courtroom and the expert launched off on a narrative where he was really just being a mouthpiece or a conduit, I mean, just assume for me, that's not happening. That's not part of the hypothetical, but it's a legitimate expert. He's done a mental evaluation. He has an opinion he wants to give about it. And the basis of his opinion, or, you know, include interviews with family members, among other things, then, then the expert can give that opinion, right? I expect that would likely come in, Your Honor. Yeah. Okay. Thank you. Mr. Anderson, how did the rule change? Was it changed by the Alabama legislature or did a, an Alabama court, uh, decide? I believe the, so the Alabama, uh, Supreme court is the author of all of the rules. Uh, they do have some subcommittees that the rules committee that, uh, proposes new rules ultimately ends up being up to the Alabama Supreme court to, to adopt them and reject them. I'm afraid I'm not intimately familiar with how that rule came to be changed. Okay. I think in Florida, it's gotta, it's gotta be done by the state legislature upon a recommendation by the Florida Supreme court. Is that the process in the state of Alabama? No, Your Honor, the legislature doesn't have a role. Uh, I lied when I told you I was going to leave you alone. So I've got the 2020 version of the Alabama, uh, rule of evidence 703. I've got the 2013 version and they both say, if a type, talking about, if of a type facts or data, uh, reasonably relied upon by experts in a particular field informing opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. So you're telling me that. So I thought the 2013 version was what was in effect during this time. You're telling me it was an earlier version. No, Your Honor, it would have been, uh, at this point, I'm looking at my 2010 volume, which in commentary to rule 703 notes that rule 703 leads unaffected the preexisting Alabama law requiring that the facts or data relied upon by the expert and gotten by the expert other than by firsthand knowledge generally must be admitted into evidence. That's what the law was in 2010, 2011. Yeah. You know, and the, the advisory committee's notes talk about that and the subsequent versions. But anyway, again, you've been, been very helpful. You've taught me a lot about this. I appreciate it. Thank you, Your Honor. It looks like my time is, uh, time is up. Uh, if the court had any questions about the second or third issue, I'd be happy to entertain them, but I don't have any time to address that. Um, and if there are no questions, then for the reasons I've given here today and for the reasons set forth in the state's brief or the, I'm sorry, the appellant's brief, uh, we'd ask that the judgment of the district court be affirmed. Thank you, Your Honors. Thank you, Mr. Anderson. Mr. Columbia, you have reserved some time for rebuttal. Thank you, Your Honor. I'd like to address, uh, certain points that Mr. Anderson made in his argument. But what I'd like to first focus on is Mr. Anderson went through a litany of things where he questioned, uh, MacArthur-Whetstone's testimony, where he questioned Roger Stoltz or questioned Donald Bowden. These are the things that should have been happening at trial, Your Honor. These are the things that should have been happening at trial and would have been happening at a trial. And a jury should have been considering all this credibility and the credibility of all these various witnesses. What was established at the second rule 32 hearing where all these witnesses did come to testify was that defense counsel did not speak to any of them. Each of these witnesses, corrections officer Cumbie, corrections officer Whetstone were asked specifically, what did anyone from Mr. Brodnax's defense interview you or come to question you? And the answer was consistently no. So the, so when combined with what the attorneys testified to at the first rule 32 hearing, there was no need for those attorneys to be questioned more specifically about this, this event. We knew, and it was in front of the courts that they had never been, that these witnesses had not been spoken to. And had they been spoken to again, we would have raised questions about the state's very tight, very narrow tunnel. Mr. Anderson brought up the fact of the officer's log, the officer's log indicates various things, including when people came on shift, which would have indicated that Mr. Whetstone came on shift at 10 o'clock that Mr. Cumbie came on, had left shift at that point. And the officer's logs, the officer's logs also actually contradict or call into question a portion of the state's timeline. Because again, going back to how Mr. Brodnax potentially hid the clothing, as Mr. Anderson said, the officer's log indicates that Mr. Brodnax did not arrive in the van back at the center until approximately 1150. That would have, but we know from officer Whetstone's testimony that the call that came into the work release center that Mr. Brodnax's wife and her grandson were dead came in approximately at midnight. That would have again, given a very short period of time for Mr. Brodnax to have hidden these, the clothes that he supposedly hid under somebody else's bunk without anyone noticing. So again, what we have here is the question of reasonable doubt. And the, and we had attorneys who were challenging the state's case and continued to challenge the state's case throughout and in closing argument, challenged the state's case. And they did so without having all of this evidence that would have allowed them to further challenge the state's case. And they could have, they would have been able to keep challenging it. And there would be a reasonable probability that this result would have been different. Had the jury been, we only needed to persuade one juror that the state's timeline didn't fit for Mr. Brodnax to have been found not guilty. And so this evidence was important and the arguments that Mr. Anderson may illustrate the importance of this evidence should have been presented to the jury and it should have been presented to the jury and should have been found so defense counsel could have properly defended Mr. Brodnax at the time with respect to issue with respect to issue two. Again, I would just stress as I did in my, in my original argument that this for him, he, and would have been admissible at Mr. Brodnax's trial in the penalty phase of that trial. And therefore to be able to prove an effective assistance of counsel, he should have been allowed to put on the evidence the way he intended for the evidence to put on, particularly because it was expert, it was material that an Finally, your honors with respect to claim three in the, in the brief that really does tie into claim number one, because the prosecutor in his opening part of his, of his closing statement before Mr. Brodnax's attorneys ever got up, said to listen, to see if they show you an explanation for this. Well, well, well, Mr. Columbia, you didn't, you didn't cover that issue. And I didn't, your honor. And so, so, so Mr. Anderson doesn't have an opportunity to respond, but the issue was briefed very well, and we'll rely on the, we'll rely on the briefs on that issue. Thank you, your honor. I was, if there are any questions about that issue, obviously I would, I would address them, but to, to conclude your honors, Mr. Brodnax, the, the evidence presented at the rule 32 hearing showed that defense counsel's investigation was deficient and that it prejudiced Mr. Brodnax had this evidence been presented at trial. It would have presented a different picture and a further challenge to the states, not only the state's timeline, but the state's evidence that they did present specifically the clothes and the boots. I would note with respect to the boots, your honor, that twice the prosecution referenced those as the key piece of circumstantial evidence, because they claimed that no one else had those boots. Office corrections officer Whetstone testified specifically that possibly over 20 inmates had those same boots. So it's not only just the timeline, it's not only just the alibi, but it's the complete case that the state had would have been challenged had Mr. Brodnax's counsel gone to the place where Mr. Brodnax lived and done the investigation they should have. This, this would be in effect, the equivalent of had Mr. Brodnax lived in a home in Birmingham and nobody went to question the neighbors about whether they saw Mr. Brodnax coming or going, they did not go to the place where Mr. Brodnax lived and investigate his comings and goings from the place where Mr. Brodnax lived. You have two minutes. For these reasons, your honor, I'll wrap up for these, for these reasons and the reasons we, we placed in the brief, we would ask that this court vacate the decision of the district court, grant habeas corpus relief to Mr. Brodnax and remand his case for further proceedings in state court. All right. Thank you, Mr. Columbia, Mr. Anderson. I think we have your arguments. And so that concludes this argument and court is adjourned. Thank you, your honor. Thank you.